**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**TROY L. WILSON,**

      **Plaintiff,**

         **v.**                          **Civil Action No.  11-303 (JEB)**

**JOHN M. McHUGH,**
**Secretary of the Army,**

      **Defendant.**

## MEMORANDUM OPINION

Plaintiff Troy Wilson, formerly a cadet in good standing at the United States Military Academy at West Point, tested positive for cocaine during a urinalysis conducted in January 2007.  He was subsequently charged under the Uniform Code of Military Justice with having wrongfully used the drug.  Wilson ultimately resigned from the USMA in lieu of disputing the charge in a trial by court-martial and received an "other than honorable" (OTH) discharge.  He was also directed to repay $143,021 in education costs he had accrued prior to his discharge.

In January 2009, Wilson submitted an Application for Correction of Military Record to the Army Board for Correction of Military Records (ABCMR), requesting that he be commissioned as an officer and provided with back pay, his discharge be upgraded from OTH to Honorable, his debt be discharged, and a press release concerning the cocaine charge be removed from the USMA's website. The ABCMR denied his application, and Wilson now seeks review of that  decision in this Court.  Having considered the parties' Cross-Motions for Summary Judgment, the Court finds that because he voluntarily resigned instead of contesting the charge leveled against him in a court-martial, Wilson cannot challenge the underlying evidence in this

forum.  With respect to his remaining claims, the Court finds that the ABCMR's decision to deny

Wilson's request was supported by substantial evidence and was not otherwise arbitrary and

capricious.  It will, therefore, grant Defendant's Motion and deny Plaintiff's.

## I.      Background

Wilson was appointed as a cadet at the USMA on June 28, 2004.  See Administrative

Record (A.R.) at 4.  He performed well at the Academy, receiving assessments that placed him in

the "Center of Mass – lower half" in 2004 and "Above Center of Mass – lower half" in 2005.

See id. at 4-5.  It was clear to his 2005 reviewer that Wilson was on his way to becoming "a very

good team leader and an officer."  Id. at 5.  He was, however, subjected to discipline on three

occasions during 2006: once for underage drinking, once for being absent, and once for driving

an unauthorized vehicle.  See id.

According to a Forensic Toxicology Drug Testing Laboratory record dated February 7,

2007, initial and verification screening tests conducted on January 11, 2007, both revealed the

presence of cocaine metabolites in a urine sample provided by Wilson.  See id. at 5, 51-53.  The

next day, "a confirmation test revealed a positive reading of 148 n[g]/ml for benzoylecgonine

which was produced by the metabolism of cocaine."  Id.  Because the Department of Defense's

cutoff for acceptable levels of benzoylecogonine is 100 ng/ml, the test led to Wilson's being

charged on February 5, 2007, under the Uniform Code of Military Justice with having

wrongfully used cocaine.  See id. at 6; Compl., ¶¶ 25-26.

The following day, the USMA Public Affairs Office issued a press release that stated that

four cadets, including Wilson, who was mentioned by name, had been charged with drug-related

offenses.  See A.R. at 6.  The release, which was posted to the internet, further noted that the

cadets would be "presumed innocent until proven guilty in trials by courts-martial" and

explained that "[t]he preferring of charges against a service member is the first step in the court-martial process." Id. at 113.  It also provided details about the pretrial investigation that would follow.  See id. at 113-14.

On March 2, 2007, Wilson's then-attorney Ronald Gladney wrote a letter "requesting and recommending a finding that the evidence in support of the Charge and its Specification against . . . Wilson [was] not sufficient to warrant referral to a court-martial, and a recommendation that the same be dismissed."  A.R. at 55.  Gladney contended that the drug test had been "barely positive" and suggested that the results were "consistent" with Wilson's having merely "touch[ed] objects that at one time contained the drug."  Id.  He also insisted that the charge was inconsistent with Wilson's character.  See id. at 56.  Attached to the letter were the *curriculum vitae* of and a report written by Terry Martinez, a Ph.D. in Pharmacology.  See id. at 61-75. Martinez identified three potential "sources of error or concern with regard to this case: 1) there [was] no record of the urine specimen collection, 2) the level of cocaine metabolites reported by the gas-chromatograph/mass spectrophotometer (GC/HS) [was] higher than the level reported by the enzyme immunoassay (EMIT) technology, and 3) the levels of reported cocaine metabolites [were] very low — all levels were below the threshold for reporting positive by the U.S. Department of Transportation, the Labor Department, the Department of Defense[,] etc. . . . ." Id. at 73.

Despite these potential avenues for attacking the prosecution, on March 7, 2007, Wilson requested to resign from the USMA in lieu of disputing the charges in a trial by court-martial. See id. at 6, 76-77.  His signed request for resignation stated that he understood that he might be discharged under "other than honorable" conditions and might be required to repay the cost of his educational expenses.  See id. at 76.  It also confirmed that he was resigning voluntarily and

noted that he had consulted with counsel and been "fully advised . . . of the nature of [his] rights prior to, during and after an appearance before a General Court-Martial." Id.  His resignation was approved and his OTH discharge made effective on June 27, 2007. See id. at 7, 78-79, 120. Wilson was also directed to repay $143,021 in education costs. See id. at 7, 81-82, 120.

In a letter dated June 27, 2007, Wilson's current counsel, David Sheldon, requested on his behalf that the February 6th press release be taken down because the Privacy Act, 5 U.S.C. § 552a, "requires that the government maintain accurate records" and "[t]he release [was] no longer accurate with respect to Mr. Wilson." Id. at 115.  Nearly two years later, in January 2009, Wilson submitted an Application for Correction of Military Record to the ABCMR. See id. at 16-31.  In it, he asked the ABCMR to commission him as an officer, upgrade his discharge from OTH to Honorable, discharge his debt, remove the press release from the USMA's website, "and grant any other relief necessary to effect whole relief such as back pay, allowances, . . . and other benefits the Board deems appropriate." Id. at 27.

"In the processing of [the ABCMR] case, an advisory opinion was obtained from the Office of the Deputy Chief of Staff." Id. at 7, 14-15.  Colonel Paul Aswell, Chief of the Officer Division, recommended that Wilson's requests be denied. See id. at 15.  Aswell noted that the "doctrine of administrative finality" precluded reconsideration of Wilson's discharge absent circumstances not present in the instant case. See id. 14.  He emphasized that Wilson "voluntarily tendered his request to resign . . . in lieu of trial by court-martial" and that his request acknowledged that his discharge might be characterized as OTH. See id. at 14-15.  In addition, he recommended denial of Wilson's request that the press release be removed. See id. at 15.

The ABCMR issued its decision officially denying Wilson's application on September 9, 2009.  See id. at 11.  It stressed that the DOD had properly applied its 100 ng/ml benzoylecgonine limit in preferring cocaine charges against Wilson.  See id. at 10.  In light of the fact that Wilson's request for resignation was "voluntary, administratively correct, and in compliance with applicable regulations," it found no basis to reconsider his OTH discharge or cancel his debt.  See id. at 10-11.  Neither did it grant his request to have the press release removed from the internet.  See id. at 10.

On February 4, 2010, Wilson filed a Complaint that initiated the instant action.  He seeks review of the ABCMR's decision under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. Both parties have now filed Cross-Motions for Summary Judgment.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  Holcomb, 433 F.3d at 895; Liberty Lobby, Inc., 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, Inc., 477 U.S. at 248; Holcomb, 433 F.3d at 895.

Although styled Motions for Summary Judgment, the pleadings in this case more accurately seek the Court's review of an administrative decision.  The standard set forth in Rule 56(c), therefore, does not apply because of the limited role of a court in reviewing the administrative record.  See Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006)

(citing <u>National Wilderness Inst. v. United States Army Corps of Eng'rs</u>, 2005 WL 691775, at *7 (D.D.C. 2005); <u>Fund for Animals v. Babbitt,</u> 903 F. Supp. 96, 105 (D.D.C. 1995), <u>amended on other grounds</u>, 967 F. Supp. 6 (D.D.C. 1997)).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  <u>Id.</u> (internal citations omitted).  Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.  <u>See</u> <u>Richards v. INS</u>, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977), <u>cited in</u> <u>Bloch v. Powell</u>, 227 F. Supp. 2d 25, 31 (D.D.C. 2002), <u>aff'd</u>, 348 F.3d 1060 (D.C. Cir. 2003).

The Administrative Procedure Act "sets forth the full extent of judicial authority to review executive agency action for procedural correctness."  <u>FCC v. Fox Television Stations, Inc.</u>, 129 S. Ct. 1800, 1810 (2009).  It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This is a "narrow" standard of review as courts defer to the agency's expertise.  <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983).  An agency is required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  <u>Id.</u> (internal quotation omitted).  The reviewing court "is not to substitute its judgment for that of the agency," <u>id.</u>, and thus "may not supply a reasoned basis for the agency's action that the agency itself has not given."  <u>Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.</u>, 419 U.S. 281, 285-86 (1974) (internal quotation omitted).  Nevertheless, a decision that is not fully explained may be upheld "if the agency's path may reasonably be discerned."  <u>Id.</u> at 286.

### III.     Analysis

By statute, the Secretary of the Army, who acts through the ABCMR, "may correct any military record of [his] department when [he] considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1).  Federal courts review final decisions of the ABCMR under the APA, which provides that a court may "hold unlawful and set aside" agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that are "unsupported by substantial evidence."  5 U.S.C. §§ 706(2)(A), (E); see Baker v. Dep't of Army, 1998 WL 389097, at *1 (D.C. Cir. 1998) Kidwell v. Dep't of the Army, Bd. for Correction of Military Records, 56 F.3d 279, 286 (D.C. Cir. 1995).

Considering the wide latitude granted to the Secretary by Congress, this Circuit has found that decisions by the ABCMR receive the benefit of an "unusually deferential application of the 'arbitrary or capricious' standard":

> While the broad grant of discretion implicated here does not entirely foreclose review of the Secretary's action, the way in which the statute frames the issue for review does substantially restrict the authority of the reviewing court to upset the Secretary's determination.  It is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act "when he considers it necessary to correct an error or remove an injustice," 10 U.S.C. § 1552(a), than it is if he is required to act whenever a court determines that certain objective conditions are met, *i.e.,* that there has been an error or injustice.

Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1514 (D.C. Cir. 1989) (emphasis in original) (Kreis I).  But this does not mean that the ABCMR's decision cannot be reviewed by federal courts; indeed, "[t]he court . . . must be able to conclude that the Board 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'"  Kreis v. Sec'y of Air Force, 406 F.3d 684, 686 (D.C. Cir. 2005) (Kreis II) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43).  The Court need only

determine, however, "whether the Secretary's decision making process was deficient, not whether his decision was correct." Kreis I at 1511.

Wilson here maintains that the ABCMR acted arbitrarily and capriciously or contrary to law when it denied his request to be commissioned as an officer, neglected to offer him back pay and other appropriate relief, declined to upgrade his discharge from OTH to Honorable, failed to discharge his debt, and did not remove the press release from the USMA's website.[1]  These challenges fall into three analytically distinct categories.  First, he disputes on various grounds the cocaine charge originally leveled against him.  As the Court will discuss shortly, these arguments all ultimately turn on whether Wilson's resignation was voluntary.  Second, he argues that he should not have to suffer the consequences — in particular, his OTH discharge and $143,021 debt — of having resigned in response to the charge.  Third, he contends that the press release issued shortly after he was charged should be removed from the USMA's website.  The Court will address each category of challenges in turn.  In the end, Wilson will have to live with the consequences of his decisions.

A.  The Underlying Cocaine Charge

Wilson's primary complaint concerns the positive drug test that kick-started the events at issue in this suit.  He asks the Court to remand the case to the ABCMR because it did not address his arguments that his drug test results were consistent with mere passive ingestion of cocaine, that his urine sample may not have been properly collected, and that the tests may not have been accurate.  See Pl.'s Mot. & Opp. at 11-14, 16.  Each of these arguments aims to undermine the validity of the cocaine charge initially brought against him. Assuming Wilson's resignation was

---

[1] Wisely, Wilson has "expressly waive[d] any right or entitlement to recover monetary damages greater than $10,000."  Compl, ¶ 6.  Had Wilson not made such a concession, the Court would lack subject matter jurisdiction because for claims exceeding $10,000, the Tucker Act, 38 U.S.C. § 1436(a)(2), vests exclusive jurisdiction in the U.S. Court of Federal Claims. See Bowen v. Massachusetts, 487 U.S. 879, 910 n. 48 (1988); Brown v. West, 1995 WL 623038, at *3 (D.D.C. 1995).

voluntary, however — an assumption that he challenges and that the Court will address — the fact that he resigned instead of contesting the charge in a court-martial precludes this line of attack.

Just as a criminal defendant who voluntarily accepts a plea offer thereby waives his right to challenge the prosecution's evidence in court, so, too, does a cadet who voluntarily resigns forgo the opportunity to dispute the strength of his charge in a court-martial. Our justice system allows those accused of unlawful conduct to evaluate the potential risks and benefits of contesting those accusations in a trial — military or otherwise — and, in light of those risks, to choose whether to accept an opportunity to resign or a plea bargain. To allow an individual who has chosen to resign or plead guilty to retain the right to challenge the evidence against him would undermine the finality of pleas and destroy the incentives that encourage the government to offer that alternative in the first place. Cf. Brady v. United States, 397 U.S. 742, 752 (1970) (highlighting the advantages — such as the conservation of "scarce judicial and prosecutorial resources" — that accrue to the government from offering plea bargains).

Indeed, in Veitch v. England, 471 F.3d 124 (D.C. Cir. 2006), our Circuit held that a serviceman could not seek review of court-martial charges brought against him when he resigned instead of contesting those charges in a court-martial. Id. at 129. Claims regarding the lawfulness of those charges, it suggested, were unexhausted:

> Congress . . . carefully designed a scheme of military appeals to prevent needless federal court review of military affairs. By resigning in the face of his court-martial charges, however, [Plaintiff] neglected to exhaust his military court remedies. See Parisi v. Davidson, 405 U.S. 34, 41-46 (1972) (recognizing the exhaustion requirement applied to courts-martial when the accused could gain complete relief before such tribunals). . . . Successfully contesting the court-martial would have provided [him] full relief from the allegedly unlawful charge . . . , and when full relief is

> available from a court-martial, civilian courts should require resort
> to that tribunal in the first instance.

Id.  If Wilson's resignation was valid, therefore, he cannot challenge the sufficiency of the

evidence relating to his cocaine charge.

Wilson appears to concede that his signed request for resignation was facially valid.  He

nevertheless contends, however, that his resignation was tendered involuntarily.  "Resignations

or retirements are presumed to be voluntary."  Veitch, 471 F.3d at 134 (quoting Tippett v. United

States, 185 F.3d 1250, 1255 (Fed. Cir. 1999)) (internal quotation marks omitted); see also Kim v.

United States, 47 Fed. Cl. 493, 497 (2000) (citing Covington v. Dep't of Health and Human

Servs. 750 F.2d 937, 941 (Fed. Cir. 1984)).  "[A] party alleging that a facially valid resignation

was in fact the product of unlawful duress must prove three elements: (1) one side involuntarily

accepted the terms of another; (2) the circumstances permitted no other alternative; and (3) the

circumstances were the result of coercive acts of the opposite party."  Veitch, 471 F.3d at 134

(citing Roskos v. United States, 549 F.2d 1386, 1389 n.11 (Ct. Cl. 1977)).  Wilson argues that

his resignation was involuntary because he "faced the Hobson's choice of a potential felony

conviction or resignation."  Pl.'s Mot. & Opp. at 14.  In addition, he suggests that his "then-

attorney's advice rendered his decision involuntary."  Id. at 15.  Because, he contends, the

ABCMR did not explicitly consider these arguments and its determination that his resignation

was voluntary was merely conclusory, he asks the Court to remand this case to the ABCMR for

further consideration.  The Court declines to do so for two reasons.

First, Wilson did not adequately raise these arguments before the ABCMR.  Wilson's

Memorandum in Support of Application for Correction of Records makes no mention of any

unsound legal advice that may have induced him to resign. While its Introduction, Statement of

Facts, and Conclusion sections allude to the fact that Wilson resigned under pressure created by

the charges hanging over his head, <u>see</u> A.R. at 19, 25, 30-31, the Argument section, which contains arguments concerning the drug test and the press release, is entirely devoid of any mention of Wilson's resignation.  <u>See id.</u> at 27-30.  Though the Conclusion in particular details the pressure Wilson was under when he decided to resign — specifically, he was "[f]aced with the prospect of a felony conviction and the prospect of serving five years in prison," <u>id.</u> at 31 — the Memorandum provides no indication that Wilson actually claimed that his resignation was involuntary as a matter of law.

Second, to the extent Wilson did raise the argument that he resigned under duress before the ABCMR, the Board's determination that the "[e]vidence of record show[ed] Wilson's request for resignation in lieu of court-martial . . . was voluntary, administratively correct, and in compliance with applicable regulations" was supported by substantial evidence and was not otherwise arbitrary and capricious.   Wilson's signed request to resign itself purports to have been made "voluntarily" and after consultation with counsel.  <u>See</u> A.R. at 76-77.  It specifically acknowledges, moreover, the possibility that he would be discharged under OTH conditions and be made to repay his educational expenses.  <u>See id.</u>  Coupled with the presumption of voluntariness, this document is strong evidence that his resignation was voluntary.

The only argument even arguably presented to the ABCMR was that the resignation was rendered involuntary by the risk of a felony conviction and jail time that would have followed from his proceeding to trial by court-martial.  This contention comes nowhere close to meeting the three-element test for duress.  Wilson may well have felt that he had no option but to resign. "[D]uress," however, "is not measured by Plaintiff's subjective evaluation of [his] circumstances."  <u>Kim</u>, 47 Fed. Cl. at 497 (citing <u>Bergman v. United States</u>, 28 Fed.Cl. 580, 586

(1993)).  Instead, "the test for duress is objective . . . ."  <u>Veitch</u>, 471 F.3d at 128; <u>see also</u> <u>Kim</u>, 47 Fed. Cl. at 497.

    Applying the three-element, objective test to similar facts, our Circuit has plainly held that a serviceman cannot "escape the consequences of [his] decision [to resign] by characterizing the court-martial charges themselves as evidence of coercion."  <u>Veitch</u>, 471 F.3d at 129.  Indeed, if this Court were to find that Wilson was put to a Hobson's choice of deciding between resignation and pursuing his arguments before a court-martial, all criminal defendants who had pled guilty in the face of the potential for significant jail time could press a duress argument in seeking to withdraw their pleas.  Having been presented with a signed request for resignation that contained thorough acknowledgements of the consequences of resignation and no evidence of duress beyond the fact that charges had been proffered against him, the Court will not disturb the ABCMR's conclusion that Wilson's resignation was tendered voluntarily.

    Ultimately, the Court is not unsympathetic to the difficult choice Wilson had before him.  It was, however, a choice.  In choosing to resign instead of contesting the drug charge before a court-martial, Wilson avoided the potential for a felony conviction and five years of jail time.  But losing the ability to challenge the adequacy of the evidence against him — in particular, the drug test — was part of the bargain.  Therefore, even if Wilson raised an argument that his resignation was involuntary, the ABCMR's rejection of that argument was supported by substantial evidence and was not arbitrary and capricious.  No reconsideration of Plaintiff's claims concerning the underlying cocaine charge is thus appropriate.

    B.  <u>The Consequences of Resignation</u>

    Wilson's Complaint, however, is not limited to the underlying charge.  He also seeks to have his discharge upgraded from OTH to Honorable and to have his $143,021 debt canceled.

The only argument he presents in his Motion concerning ABCMR's denial of his claims on these issues, however, relates to the "questionable urinalysis" and "the underlying validity of his separation." Pl.'s Mot. & Opp. at 17. In light of the Court's decision that Wilson had no right to ABCMR review of the drug test, his subsequent OTH discharge and educational debt similarly cannot be called into question on that ground.

Were Wilson to argue alternatively that the Board, despite his resignation, still should have upgraded his discharge to Honorable and canceled his debt, the ABCMR's decision was supported by substantial evidence and was not arbitrary and capricious. As the ABCMR noted, when Wilson enrolled at the USMA he "entered into an agreement to reimburse the United States if he failed to complete the course of instruction at the USMA due to misconduct." A.R. at 8; see also id. at 32. His request for resignation, furthermore, acknowledged that he could be required to repay the cost of his education and that he could receive an OTH discharge. See id. at 76. In addition, he was provided with an account of the cost of his education on April 2, 2007, which was before his request for resignation was approved. See id. at 81-82. Wilson has raised no question as to the accuracy of the amount owed nor any reason independent from the validity of the cocaine charge that he should not be made to pay it. Although it is unfortunate that "a young adult without a college degree and his family are burdened with a $143,021 debt that will undoubtedly impose a substantial hardship on them," A.R. at 30, that is not cause to overturn as arbitrary and capricious the ABCMR's judgment.

C.  The Press Release

Finally, Wilson maintains that the ABCMR erred by denying his request to have the press release about his charge taken down from the USMA's website. He asserts that the information contained therein "is inaccurate as . . . Wilson did not undergo court-martial processing as the

press release suggests." Id. at 27, 30. Once he resigned, he suggests, "the information regarding his court-martial process no longer applied" and, accordingly, the release "no longer accurately portrayed [his] legal situation." Compl., ¶¶ 35-37. The ABCMR denied Wilson's request to have the release removed, however, reasoning that "since there is insufficient evidence to show the applicant was improperly discharged, there is an insufficient basis on which to grant this relief." A.R. at 10. Wilson contends that this decision  evinced "a clear lack of regard for truth and the privacy of [Plaintiff]" and "denied Plaintiff his right to be free from false reports published regarding his character and legal status," Compl., ¶ 54, and was thus arbitrary and capricious and contrary to law in violation of the APA.

In response, the Agency argues that because Wilson's claim concerning the press release "invokes the Privacy Act as his statutory source of relief, dismissal of this claim is warranted for lack of subject-matter jurisdiction." Def.'s Opp. & Reply at 13. The Agency is correct that because the APA provides review of final agency action only where "there is no other adequate remedy," 5 U.S.C. § 704, a "plaintiff cannot bring an independent APA claim predicated on a Privacy Act violation." Tripp v. Dep't of Defense, 193 F. Supp. 2d 229, 238 (D.D.C. 2009); see also Mittleman v. U.S. Treasury, 773 F. Supp. 442, 449 (D.D.C. 1991). To the extent he relies on the Privacy Act and believes the Privacy Act provides him a legal remedy, therefore, Wilson cannot seek review in this Court under the APA.

While Wilson mentions the Privacy Act in his Complaint as one of the "applicable statutory directives to DOD and the Army" of which the ABCMR's decision ran afoul, see Compl., ¶ 54, he seems to do so only in passing and premises his claim to relief on the APA, not the Privacy Act. In his Cross-Motion, however, his only argument regarding the press release is that the Board did not consider, as the Privacy Act requires, "whether the press release itself is

'not accurate, relevant, timely, or complete.'"  Pl.'s Mot. & Opp. at 18 (quoting a section of the

Privacy Act, 5 U.S.C. § 552a(d)(b)(i)).  His Reply does not respond to the Agency's argument

that APA review is unavailable for Privacy Act claims and merely reiterates this argument.  See

Pl.'s Reply at 6-7.  His briefing thus suggests that the Privacy Act does form the basis of his

claim, and if that is the case, § 704 of the APA precludes this Court's review.

　　　　To the extent Wilson's claim concerning the press release is independent from and goes

beyond the Privacy Act, however, the ABCMR's decision was supported by substantial evidence

and was not arbitrary and capricious.  The portion of the press release that concerned Wilson

stated, in relevant part:

> Cadet Troy Wilson, E Company, 4th Regiment, Class of 2008, was
> charged with one violation of Article 112a (Wrongful Use of a
> Controlled Substance – Cocaine) of the UCMJ. . . .
>
> The cadets will continue with their regular duties and are not in
> pretrial confinement.  They are presumed innocent until proven
> guilty in trials by courts-martial.  Cadets, like other members of the
> military, are subject to military law contained in the UCMJ, a
> federal statute.
>
> The preferring of charges against a service member is the first step
> in the court-martial process.  The next step is a pretrial
> investigation pursuant to Article 32, which is similar to a civilian
> grand jury.

A.R. at 113-14.

　　　　Because the ABCMR found that the charge brought against Wilson was founded on a valid

drug test and that he resigned voluntarily, it determined that the press release was not inaccurate

as Wilson had claimed.  That that determination was not arbitrary and capricious seems self-

evident: Wilson was in fact charged as the press release states.  Although Wilson resigned in lieu

of proceeding through the court-martial process, this does not undermine the accuracy of the

release's description of the manner in which that process ordinarily unfolds.  The Court,

accordingly, will deny Wilson's claim that the ABCMR erred in denying his request to have the press release removed from the internet.

**IV.  Conclusion**

      For the aforementioned reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's.  A separate Order consistent with this Opinion will be issued this day.

                                              /s/ James E. Boasberg
                                              JAMES E. BOASBERG
                                              United States District Judge

Date:  February 9, 2012